UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARK ALAN BRISTOW and FELIXBERTO TINGA VILLAMIL II, Plaintiffs, v. ALEJANDRO MAYORKAS, as SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY, *et. al.*, Defendants. | No. 22 C 991 Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mark Bristow, a United States citizen, has filed a Form I-130 petition for an immigrant visa on behalf of his husband, Plaintiff Felixberto Tinga Villamil II. Form I-130 is intended to help relatives and spouses of American citizens obtain an immigrant visa to lawfully remain in the United States. The United States Citizenship and Immigration Services ("USCIS" or "Defendant") denied Plaintiffs' petition on July 6, 2022. USCIS does not dispute that Bristow and Villamil are in a bona fide marriage; instead, USCIS denied Plaintiffs' I-130 petition because it found that nearly two decades earlier, Villamil had attempted to evade immigration laws by entering a sham marriage with an American woman named Marilyn Pass. That sham marriage, USCIS contends, disqualifies Plaintiff Villamil from eligibility for lawful status pursuant to 8 U.S.C. § 1154(c).

Both parties have moved for summary judgment. For the reason explained below, the court grants Plaintiffs' motion [40], denies Defendants' motion [37], and remands to USCIS for a more developed record.

## **STANDARD OF REVIEW IN ADMINISTRATIVE PROCEEDINGS**

Generally, for a noncitizen[1] to remain in the country and adjust his status to that of a lawful permanent resident, he must have an immigrant visa. *See* 8 U.S.C. §§ 1151–54. One way an immigrant can obtain a visa is through a Petition for Alien Relative, known as a Form I-130 petition. *Id.* § 1151(b)(2)(A)(i); 8 C.F.R. § 204.1(a)(1). This petition is filed by a U.S. citizen on behalf of his or her noncitizen child, spouse, or parent, and requests that the government recognize the noncitizen as an "immediate relative" for immigration purposes. *Id.* Approval of an I-130 petition allows the noncitizen to then file a Form I-485 petition to have his immigration status adjusted to that of a lawful permanent resident (i.e. obtain a Green Card). *See* 8 U.S.C. § 1255(a).

When filing a Form I-130 petition, a married couple bears the initial burden to produce evidence showing the government that their marriage is bona fide. 8 U.S.C. § 1361; 8 C.F.R. § 204.1(f)(1). To establish that a marriage is bona fide, a couple must provide primary evidence that shows "at the time of the marriage, they intended to establish a life together." *Fliger v. Nielsen*, 743 F. App'x 684, 687 (7th Cir. 2018) (citing *Surganova v. Holder*, 612 F.3d 901, 904 (7th Cir. 2010) and *Matter of Laureano*, 19 I&N Dec. 1, 2–3 (BIA 1983)). An Immigration Officer then investigates the submitted evidence and interviews the couple, and if the officer "determines that the facts stated in the petition are true and that the [noncitizen] in behalf of whom the petition is made is an immediate relative," the officer "shall . . . approve the petition . . . ." *Ogbolumani v. Napolitano*, 557 F.3d 729, 733 (7th Cir. 2009) (quoting 8 U.S.C. § 1154(b)).

USCIS must deny the I-130 petition, however, if it determines that the noncitizen "has received (or tried to receive) immigration benefits through a sham marriage," including during previous marriages. *Id.* (citing 8 U.S.C. § 1154(c)[2]). In determining that a marriage was

---

[1] The court uses the term "noncitizen" as equivalent to the statutory term "alien." *See, e.g.*, *Santos-Zacaria v. Garland*, 598 U.S. 411, 414 n.1 (2023).

[2] In relevant part, 8 U.S.C. § 1154(c) states that "no petition shall be approved if (1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or

2

fraudulent, the government bears the initial burden of demonstrating, through "substantial and probative" evidence, that the marriage was entered to evade immigration laws. 8 C.F.R. § 204.2(a)(1)(ii). Substantial and probative evidence requires more than a preponderance of the evidence but less than clear and convincing evidence; in other words, the government "must establish that it is more than probably true that the marriage is fraudulent." *Anyaso v. Mayorkas*, No. 21-CV-1676, 2024 WL 532223, at *6 (N.D. Ill. Feb. 9, 2024) (quoting *Matter of P. Singh*, 27 I. & N. Dec. 598, 607 (BIA 2019)). If the government meets its burden, the petitioner then bears the burden to show otherwise. *Id.* A "good faith-marriage motivated only in part by immigration benefits is not illegal." *United States v. Edwards*, 869 F.3d 490, 495 n.1 (7th Cir. 2017)

## BACKGROUND

### I. Plaintiff Villamil's Marital History

Plaintiff Felixberto Villamil is a noncitizen who was born in the Philippines and immigrated to the United States in 1999, eventually settling in Chicago, Illinois. (Defs.' L.R. 56.1 Statement of Material Facts ("DSOF") [38-1] ¶ 1; *see also* Ex. 8 to Am. Compl. for Mandamus Inj. and Decl. Relief ("Am. Compl.") [21-1] at 63–64.) Since arriving in the United States, Villamil has been married three times, to three different individuals. (DSOF ¶ 7.) His first marriage was on April 10, 2001 to Marilyn Pass, a U.S. citizen, and was registered in Cook County, Illinois. (DSOF ¶ 8; *see also* Certified Administrative Record ("R.") [35-1] 0253.) Two weeks after getting married, Pass filed a Form I-130 petition on Villamil's behalf, and Villamil concurrently filed a Form I-485 petition. (DSOF ¶¶ 8, 14.) In October of 2003, some two and a half years after the petitions were filed, Pass and Villamil were interviewed by a USCIS officer to determine the legitimacy of their marriage. (*Id.* ¶ 9.) Prior to the interview, the couple submitted multiple documents to establish

---

preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws, or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws."

3

their relationship, including a rental lease agreement, rental payment receipts, a health insurance enrollment form, and phone and electricity bills, with both Pass and Villamil listed on these documents. (*Id.* ¶ 11; R. 0254–64.) Villamil also disclosed to USCIS that he had a daughter, from a previous relationship, who lived in the Philippines. (Pls.' L.R. 56.1 Statement of Additional Material Facts ("PSOF") [42-1] ¶ 12.)

On May 25, 2006, after reviewing their supporting documentation and individually interviewing Villamil and Pass, USCIS found that the two had "not established by a preponderance of evidence that [they] married in good faith" and denied their petitions. (R. 0042.) The decision letter noted that Villamil and Pass provided their interviewer with conflicting accounts of how they first met: Villamil told the interviewer that they met at school and Pass stated that they met at a party. (*Id.*) The letter also stressed the limited amount of documentation they provided in support of their petitions, noting that despite the two "hav[ing] been married for more than two and half years prior to the interview . . . [m]ost of the documentation was issued the same month as [the] interview, except for the rental lease that was issued one-month prior to the interview." (*Id.*) The court notes that this is not accurate: the decision letter acknowledges only three of the five documents the couple submitted (ignoring the phone and electric bill records) and incorrectly states that most of the documents were issued within one month of the USCIS interview, when in fact the health enrollment form, rent and electricity payments, and phone service verification letter are dated from the previous year. (*See* R. 0254–64.) The couple had an opportunity to appeal the decision denying their I-130 petition, but did not do so. (DSOF ¶ 14.) Instead, less than a month after their petition was denied, they filed for a divorce, which was granted on August 11, 2006. (*See* R. 0162–64.)

On August 30, 2006, just a few weeks after his divorce from Pass was final, Villamil married Cecilia Ruiz Poyaoan. (*See id.* 0156.) The record contains very little information concerning Poyaoan and her roughly twelve-year marriage to Villamil, but in 2022, Poyaoan submitted a declaration in support of Bristow's I-130 petition on behalf of Villamil. According to

4

that declaration, Poyaoan was born in the Philippines[3] and is fifteen years older than Villamil. (*Id.* 0045.) Poyaoan stated that she met Villamil at work around March 2001 and then lived with him as a roommate in April 2001—along with Ms. Pass, Villamil's then-wife—until Villamil and Pass eventually moved out (she does not say when). (*Id.*) It is not clear from the record that Villamil and Poyaoan ever lived together as a married couple, but at some point during their marriage Villamil came out as gay. (PSOF ¶ 13.) On April 20, 2018, the two divorced. (R. 0155.) Poyaoan herself never filed a Form I-130 petition on behalf of Villamil. (PSOF ¶ 7),

On May 5, 2018, about sixteen days after his divorce from Poyaoan was final, Villamil married Mark Bristow, his co-Plaintiff in this case. (*Id.* 0154.) On August 28, 2019, Bristow filed a Form I-130 petition on Villamil's behalf, and Villamil concurrently filed a Form I-485 petition to obtain a Green Card. (DSOF ¶ 19.) In support of these petitions, Plaintiffs submitted an abundance of primary documents confirming the legitimacy of this marriage, including records of a real estate purchase agreement; a joint bank account; health insurance forms; gym memberships; airline tickets; and several pictures and social media posts of the two, many of them depicting the couple together on vacation, often with Bristow's family. (*See* R. 0179–227.) Indeed, these documents portray a relationship that began as far back as March of 2008.[4] (*See id.* 0180.) Plaintiffs' petition also included statements from friends and family (Brian Bristow, Christine Gomez, and Luciano Pedroza) attesting to the legitimacy of Plaintiffs' relationship. USCIS interviewed Plaintiffs in connection with their visa petitions on December 16, 2019; the record contains no information concerning of the substance of these interviews. (DSOF ¶ 19.)

---

[3] It is unclear from the record whether or not Ms. Poyaoan is a U.S. citizen, but she does appear to have an Illinois's driver's license. (R. 0046.)

[4] The legitimacy of Villamil's marriage to Poyaoan is not at issue here, and neither side in this case comments on the fact that the start of Villamil and Bristow's relationship overlapped with Villamil's marriage with Ms. Poyaoan.

II.     **Notice of Intent to Deny**

Almost two and a half years after the interviews, on April 8, 2022, USCIS Field Office Director Kevin Riddle issued a Notice of Intent to Deny (NOID) Bristow's I-130 petition on April 8, 2022. (*Id.* ¶ 20.; R. 0035–38.) The NOID stated that "based on a review of the record, USCIS finds that the approval of your Form I-130 is prohibited under [8 U.S.C. § 1154(c)] because . . . [Villamil] married his ex-wife, Marilyn Pass, for immigration purposes." (R. 0036.) It explained that as part of Bristow's I-130 petition, Immigration Officers investigated Villamil's first marriage, speaking with Pass, Pass's mother, and unnamed friends of Villamil. (*Id.* 0036–37.) According to the NOID, during this investigation, Pass told the Officers that she married Villamil solely to help him obtain immigration benefits; that she never lived with Villamil nor had a sexual relationship with him; that she in fact had a different boyfriend, that Villamil was living with his brother at the time of the marriage; and that Villamil had coached her on how to respond if she were ever to be contacted by immigration officers. (*Id.*) Pass's mother allegedly told the Immigration Officers that she had never heard of Villamil; that to her knowledge, Marilyn Pass only dated Black men (Villamil is not Black); that she believed her daughter would have told her if she were married; and that she suspected Villamil had likely stolen Marilyn Pass's identity to apply for immigration benefits. (*Id.* 0037.) Finally, the NOID stated that "Immigration Officers also spoke to friends of [Villamil] that know [sic] him during the period he was married with Ms. Pass"; these unnamed individuals "were not aware of the marriage with Ms. Pass or Ms. Poyaoan" and told the Officers that Villamil had lived with his brother from 2001 to 2006. (*Id.*) Based on this evidence, the letter concluded that Villamil's marriage to Pass was a "sham marriage" and that Villamil's having engaged in a sham marriage barred approval of his I-130 petition. (*Id.*) The NOID advised Plaintiffs that they were afforded an opportunity to submit countervailing evidence in opposition to the proposed denial. (*Id.*)

Plaintiffs, through counsel, responded to the NOID on June 7, 2022. (DSOF ¶ 32; R. 0027–33.) The response letter included a seven-page legal brief and declarations signed under

6

penalty of perjury from Villamil's brother Christopher Villamil, from Cecilia Poyaoan, and from Marilyn Pass. (R. 0039–49.) The three declarations contradicted some of the findings of the Immigration Officers' investigation. Pass's declaration claimed that the investigation's findings were fabricated. In her account of her interaction with USCIS officers, as set forth in the declaration, Pass had been pressured into accepting spoon-fed statements that they provided. Her statement reads in full as follows:

> I am writing this because immigration recently sent notice to Felix [Villamil] about his case that contains false information about what I said to an immigration officer. I want to tell you what really happened.
>
> I believe it was March 2 officer Jordan called my cell phone and asked to talk to me. He said he had tried to come to my house but couldn't get in the gate. He said he was with his partner and he was doing an investigation about my marriage to Felix. He told me he would come by my work to talk. While on the phone he kept telling me to listen I know you only married Felix to help him and I was like no. I was married to him. This was real. He kept saying no this can't be real.
>
> A few minutes later he showed up at my work. I talked to him for about 10 minutes. I was really uncomfortable because it was at work. He told me he needed me to sign a statement about my marriage to Felix. So I said ok what does it need to say. He said it would say I only married Felix to help him and that we didn't live together. All the things that are listed in the notice that they are claiming I said was actually what the officer said he wanted me to put in a statement. I did not say any of that to the officer. None of the information listed is true.
>
> After he told me what he wanted me to say I said no I want a lawyer I'm not signing anything like that because it's not true. After I told him he wanted a lawyer he was like oh well I guess I have to continue my investigation then and talk to all of your family. He kept saying how much easier it'd be if I just signed the statement and that this would get difficult for me. But I told him I wanted a lawyer.
>
> Later that day I contacted a lawyer to talk about this and she contacted the officer for me to tell him that I would give a statement and we can set up a time for me to come into the office where I could make a signed statement in person and under oath with my lawyer present about my marriage to Felix and that I would answer his questions. My lawyer tried to contact the officer many times to set this up. Finally many days later the officer told my lawyer he didn't need me to come in so I thought I was done dealing with these issues.
>
> Apparently the officer spoke to my mother too but it doesn't make sense why he would talk to my mother about a marriage from so long ago more than 20 years. My mother wouldn't have known anything about Felix and I didn't even know when my mother was married.
>
> My marriage to Felix was real. I did not marry him just to help him.

7

(*Id.* 0040.)

Christopher's declaration similarly rebutted the USCIS findings. Christopher stated that he "did not live with Felix from 2001 to 2006 as U.S. Immigration claims" but in fact lived with his brother for just one month in March 2001 and then moved to California in April 2001. (*Id.* 0048.) (*Id.*) He claimed that he moved back to Chicago in May of 2002 but did not live with his brother then, either, and that he was eventually deported to the Philippines in March of 2003 and has been there since. (*Id.*) As described earlier, Poyaoan's declaration stated that she met Villamil at work in March 2001 and lived with him and Pass beginning in April 2001. (*Id.* 0045.) Her declaration corroborated Christopher's account, in that she recalled meeting Christopher in May 2002 upon his return from California, that he "left the U.S. in 2003"; and that Christopher, who had said he lived with his brother in March 2001, in fact did not otherwise live with Villamil "from 2001 to 2003." (*Id.*) Poyaoan also discussed Plaintiff Villamil's relationship with Pass, explaining that she "remember[s] Felix introducing [her] to Marilyn Pass as his girlfriend" and that she "know(s) Felix and Marilyn got married in April 2001 but ultimately divorced some years later." (*Id.*) She concluded by declaring, that "[a]s someone who has had a previous relationship with Felix, following his marriage to Marilyn but before his relationship with Mark Alan Bristow, I can say that Felix was always honest with me about personal details of his life. This includes previous relationships, including his ex-wife Marilyn." (*Id.*)

Plaintiffs' legal brief in response to the NOID highlighted the inconsistencies between USCIS's findings and these three declarations and ultimately argued that USCIS did not meet its burden of showing marriage fraud by "substantial and probative evidence." Because the government failed to meet that initial burden, Plaintiffs argued that they were not required to rebut USCIS's claim that Villamil's marriage to Pass was fraudulent. (*Id.* 0027–28.) In making these arguments, Plaintiffs emphasized that USCIS had not turned over any "concrete evidence" that Pass or the unnamed friends had made the unsworn statements on which USCIS relied for its findings. (*Id.*)

8

**III.     USCIS's Final Decision**

On July 5, 2022, USCIS, again through Director Riddle, issued a seven-page decision denying Plaintiff Bristow's Form I-130 petition. (*See Id.* 0007–13.) In it, USCIS recognized that "[Bristow's] current marriage with [Villamil] appears bona fide after a complete review of the record," but nevertheless held that Villamil is barred, under 8 U.S.C. § 1154(c), from having an I-130 petition approved on his behalf because of his previous marriage with Pass. (*Id.* 0008.) The decision took into account the various declarations Plaintiff provided in his response to the NOID but determined that they were "not strong enough to overcome the substantial and probative evidence of marriage fraud." (*Id.* 0009.)

The bulk of the decision addresses the allegations made in Pass's declaration head-on. In particular, the decision underscored the inconsistencies in Pass's account by elaborating on the Immigration Officers' field notes[5] regarding their interactions with Pass. As one might expect, the Officers' account of the interaction varied greatly from Pass's. The court provides, in relevant part, USCIS's summary of the Officers' report:

> On March 2nd, 2022, Immigration Officers contacted Ms. Pass telephonically to discuss the circumstances leading to her marriage to and subsequent divorce from the beneficiary. Two Immigration Officers identified themselves as being USCIS employees and explained they were conducting an inquiry to determine benefit eligibility on behalf of the beneficiary. Ms. Pass consented to the interview. At first she did state that she loved the beneficiary and that their marriage ended because the beneficiary realized he was gay. Immigration Officers reminded her of the sequence of events when Ms. Pass [had] filed a petition on behalf of the beneficiary. The Immigration Officer stated to her that the petition was denied for not submitting sufficient evidence of a legitimate marriage. After the petition was denied, the beneficiary filed for divorced [sic] on June 12, 2006. Immigration Officers informed Ms. Pass that during the same week her divorce with the beneficiary was finalized he entered into another marriage with their mutual friend Ms. Poyaoan. Ms. Pass was completely unaware that the beneficiary had entered into a marriage with Ms. Poyaoan. Ms. Pass expressed her frustration that Ms. Poyaoan and the beneficiary did not disclose this information to her. Ms. Pass stated that this must look "crazy" that two friends and previous co-workers married the same individual. Immigration Officers agreed that they looked like fraud indicators. At that time Ms. Pass voluntarily provided the statements mentioned

---

[5]     *See* R. 0274–276.

> before in the NOID, that she entered into a sham marriage with the beneficiary for the sole purpose for him to get immigration benefits.
>
> . . . Ms. Pass agreed to meet the two Immigration Officers in her employers parking lot. Upon her approach to the officers' vehicle, Ms. Pass appeared visibly upset. She informed the officers that she had spoken to the beneficiary, something that was not mentioned in her typed statement submitted with the NOID response. Ms. Pass also informed the immigration officers that the beneficiary instructed her to say that she wanted legal representation before speaking to them. Up to this point, Ms. Pass never indicated she wanted an attorney. She continued to probe the officers more to determine possible consequences for not cooperating. Ms. Pass stated that the beneficiary indicated that her cooperation with the officers could result in criminal consequences on her behalf. Immigration Officers informed her that she could decline to speak to them. Immigration Officers did explain to her that they would continue to develop the case through interviewing family, friends, and other records. Ms. Pass did continue to question the officers for 15 min or so regarding the consequences of signing a written statement. During the back-and-forth between Immigration Officers and Ms. Pass the beneficiary was repeatedly calling Ms. Pass urging her to not cooperate with the officers. Ms. Pass informed the immigration officers that she informed the beneficiary that she had already admitted the marriage was fraudulent. Ms. Pass at one point stated that the beneficiary indicated that he would hire an attorney for her. Immigration Officers decided to terminate the interview and provided Ms. Pass their business cards.

(*Id.* 0010–11.) Based on this report, USCIS found that Pass's declaration submitted with the NOID response was "inconsistent with her prior telephonic statements to the Immigration Officer." (*Id.* 0011.) The decision letter also discredited her later recantation of her telephonic admissions during the in-person meeting she had with the Officers, on the grounds that by that point she had been "repeatedly contacted by [Villamil] who was urging her not to cooperate and offering to hire an attorney for her." (*Id.*) The decision also found it significant that Pass repeatedly asked the Officers what the consequences of her cooperating would be. (*Id.*)

Beyond pointing out the differences between these two accounts, USCIS's decision explained its reasons for placing more evidentiary weight on the Officers' report. It noted that two Immigration Officers corroborated their version of the encounter with Pass, and that "[o]fficial government documents," such as "detailed field reports from on-site visits and field investigations" carry more weight than informal evidence. (*Id.*) The decision also emphasized fraud indicators concerning Villamil's marriage to Pass, including that the couple provided different stories about how they first met and only "provided evidence of commingled assets for one month or less." (*Id.*

10

0011.) Finally, the denial decision also took issue with what it viewed as technical deficiencies in Pass's declaration: that her "typed statement is not under oath and no identification was provided along with [it]." (*Id.*) The court notes, however, that although her letter was not accompanied with any identification (such as a driver's license), it was indeed sworn; her letter concluded with the words "I declare under penalty of perjury that the foregoing is true and correct" and was signed "Marilyn Pass" and dated April 14, 2022.[6] (*Id.* 0040.) The denial decision also stated that "the phone number provided with Ms. Pass [sic] statement is not registered to her" but this too is misleading; the phone number provided in her declaration is Pass's contact number and in fact matches the number that the Immigration Officers have listed for Pass in their field report. (PSOF ¶ 4.)

The July 5, 2022 decision also highlighted discrepancies in Poyaoan's statements to USCIS. Poyaoan was interviewed by Immigration Officers on March 1, 2022; when asked why Pass and Villamil divorced, she responded that she did not know the circumstances of the divorce and did not personally know Pass, yet in her declaration she claimed that she lived with Pass and Villamil in April 2001. (*Id.* 0010.) USCIS also discounted the veracity of Poyaoan's and Christopher's statements given their close relationship with Villamil. (*Id.* 0009.)

Based on its review of the record, USCIS found that Bristow's Form I-130 petition must be denied under 8 U.S.C. 1154(c) because of "substantial and probative evidence" that Villamil married Pass for fraudulent reasons. (*Id.* 0012.) The denial decision advised Plaintiffs that they

---

[6] *See* 28 U.S.C. § 1746 ("Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form . . . 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)'.")

could appeal to the Board of Immigration Appeals ("BIA"), and that otherwise the decision would become final. (*Id.* 0013.) In lieu of appealing the decision to the BIA, Plaintiff allowed the decision to become final and filed an action in this court asking that USCIS's decision be set aside as arbitrary and capricious in violation of the Administrative Procedure Act ("APA").[7] (*See* Am. Compl. [21].) The record contains no indication that USCIS has initiated removal proceedings against Villamil.

## DISCUSSION

The primary avenue for federal court review of immigration decisions does not fall under the APA; instead, it involves filing a petition for review of a final order of removal in the appropriate court of appeals. *Dhakal v. Sessions*, 895 F.3d 532, 538 (7th Cir. 2018) (citing 8 U.S.C. § 1252(a)(5) and *Ardestani v. INS*, 502 U.S. 129, 133 (1991)). Petitioners' case is properly brought under the APA, however, because "the decision to deny a Form I-130 petition is not a discretionary agency decision and [Villamil] is not yet subject to a removal order." *See Fliger*, 743 F. App'x at 687 (citing *Sehgal v. Lynch*, 813 F.3d 1025, 1027 (7th Cir. 2016) and *Ogbolumani*, 557 F.3d at 733). Under the APA, the agency's decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence in the case, or not in accordance with law." *Id.* (internal quotation marks and citation omitted). The standard here is demanding, and so long as a reasonable mind could find adequate support for the decision, it is not arbitrary or capricious. *Ogbolumani*, 557 F.3d at 733 (citation omitted). However, under the *Chenery* doctrine, the court is "not permitted to affirm the order of an administrative agency on a ground

---

[7] Neither party has raised an exhaustion issue, and the court concludes there is no "failure to exhaust" bar to Plaintiffs' case. In claims brought under the APA, a plaintiff is only required to exhaust the administrative remedies that are mandated by statute or regulation. *Darby v. Cisneros*, 509 U.S. 137, 153–54 (1993). Under the Immigration and Nationality Act and its implementing regulations, a plaintiff challenging the denial of an I-130 Petition is not required to exhaust his administrative remedies prior to bringing claims in federal district court. *See Bangura v. Hansen*, 434 F.3d 487, 498 (6th Cir. 2006); 8 § C.F.R. 103.3(a)(1)(ii) (stating that a petitioner "may" appeal to the BIA).

that the agency did not rely upon in making the order." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Despite this generous standard of review, the court concludes that USCIS has not met its burden of showing marriage fraud by *substantial and probative* evidence as required. *See* 8 U.S.C. 1154(c); 8 C.F.R. § 204.2(a)(1)(ii). The government does not satisfy this burden by merely showing that the marriage was not bona fide; it must affirmatively prove that the marriage was fraudulent at its inception. *See Anyaso*, 2024 WL 532223, at *7. The Board of Immigration Appeals has observed that "the evidence of fraud must be relatively high to trigger [8 U.S.C. 1154(c)]" because "the consequence of engaging in marriage fraud . . . is a permanent bar to the approval of any future visa petition." *Matter of P. Singh*, 27 I. & N. Dec. 598, 607 (BIA 2019). Indeed, "[m]ost of the Federal court cases addressing marriage fraud under [8 U.S.C. 1154(c)] involve direct evidence of fraud, often a sworn statement admitting to the fraud that has not been credibly refuted or rebutted." *Id.* at 608. Where there is no such direct evidence, courts typically require "very strong circumstantial indicia that the couple never intended to establish a life together." *Anyaso*, 2024 WL 532223, at *7 (citing *Dinh v. United States*, 670 F. App'x 505, 506 (9th Cir. 2016)).

USCIS's determination that Villamil and Pass were involved in a fraudulent marriage rested on (1) Pass's alleged telephonic confession of marriage fraud to the Immigration Officers; (2) statements from Pass's mother and friends of Villamil that they were unaware of the marriage between Pass and Villamil; and (3) the lack of evidence of a bona fide marriage in Pass and Villamil's 2001 I-130 petition. At first glance, this may appear to be sufficient to meet the high bar set by § 1154(c); but a closer examination of the record and USCIS's decision undermines that conclusion.

First, there is USCIS's assessment of Pass's alleged confession, which is the singular piece of direct evidence suggesting marriage fraud. "Indeed, the government comes close to

13

relying solely on that statement." *Delcore v. Holder*, No. 13 CV 8266, 2015 WL 1858363, at *4 (N.D. Ill. Apr. 20, 2015) (finding that evidence failed to satisfy government's burden of proving marriage fraud). Recall that Immigration Officers assert Pass confessed over the phone to orchestrating a sham marriage with Villamil, though she purportedly refused to formalize this admission in a written statement when confronted in person by the Officers outside her workplace. Because Pass never signed a statement, the sole basis for her alleged confession rests on the Officers' own recollections documented in their field report notes. (R. 0274-75.) Significantly, however, the record also contains Pass's sworn declaration, signed under penalty of perjury, wherein she denies making such admissions to the Officers and affirms the legitimacy of her union with Villamil. (*Id.* 0040.) USCIS's denial decision discounts Pass's declaration as a mere "typed statement . . . not under oath" (*Id.* 0011), but that statement in fact meets all the requirements of 28 U.S.C. § 1746 and thus carries the force of a sworn declaration. USCIS has not provided a satisfactory rationale for its decision to honor the Officer's notes and discredit Pass's sworn account. The USCIS denial decision did find support in Pass's reactions during the in-person discussion with the Officers in the parking lot; those reactions could well be evidence Pass knew she was lying to the officers and was worried about her own potential criminal liability. But it is also possible that Pass believed the marriage was indeed valid and fell apart because Villamil is gay. She may have believed the officers would not accept that account, and that it might be best to say nothing rather than risk prosecution.

      USCIS's decision to discount Pass's sworn statements, effectively neutering Plaintiffs' strongest case against marriage fraud, is troublesome. And the court is equally uncomfortable with USCIS's apparent heavy reliance on Pass's original purported statements to officers to meet its burden of showing "substantial and probative evidence" of fraud. Other cases in which courts have affirmed agency determinations of marriage fraud appear to have involved more probative evidence. *See Ogbolumani*, 557 F.3d at 733 (affirming finding of fraud where the noncitizen's former wife stated she had been offered money for marriage, and the noncitizen himself

14

confessed to investigators that he "felt [h]e had no other way to obtain [his] immigration benefits"); *Ghaly v. INS*, 48 F.3d 1426 (7th Cir. 1995) (affirming finding where noncitizen's wife signed sworn affidavit stating she married noncitizen for a fee); *Segal v. Johnson*, 105 F. Supp. 3d 860, 871 (N.D. Ill. 2015) (affirming finding where "both parties to the marriage explicitly . . . admitted that their marriage was a sham," including the noncitizen in a sworn statement). Unlike in these cases, Pass's only statement in the record is an unsworn thirdhand statement allegedly related to investigators in a telephone conversation. USCIS may rely on hearsay evidence only "so long as it's probative and its use is not fundamentally unfair." *Lam*, 698 F.3d at 535 (citing *Ogboluamani*, 557 F.3d at 734). And significantly, Pass made this statement after initially informing the officers *otherwise*, stating that she had married Villamil for love. Moreover, when USCIS officers confronted Pass in a parking lot just minutes after this call, Pass gave no further statements in support of the notion that her marriage to Villamil was fraudulent. Pass later denied making the telephone statement at all. *Cf. Ogbolumani*, 557 F.3d at 734 (affirming finding of fraud where plaintiff backtracked from prior incriminating statement but did not explicitly deny making it). Even reading these facts in the light most favorable to the agency, and acknowledging that it was not bound to strict evidentiary rules of hearsay, the purported "confession" that serves as the linchpin of USCIS's case here is murky at best.

USCIS could, of course, rely on circumstantial evidence of fraud as the foundation for its ruling, so long as there is "very strong circumstantial indicia that the couple never intended to establish a life together." *Anyaso*, 2024 WL 532223, at *7. In this case, however, even the purported circumstantial evidence of marriage fraud that USCIS relies on is shaky, in the court's view. For example, the Officers noted that Pass's mother told them, over the phone, that she was unaware of her daughter's marriage to Villamil, but Pass's sworn declaration also squarely addresses this issue, asserting that her mother would not have known about the marriage and that she "didn't even know when [her] mother was married." (R. 0040.) The agency did not explain how it weighed these two conflicting accounts. The Officers' field notes are also

15

inconsistent with the sworn affidavit of Villamil's brother, Christopher. Specifically, their field notes claim that "friends" of Villamil told them that he lived with his brother Christopher from 2001 to 2006 (*Id.* 0009); but Christopher's sworn affidavit makes clear not only that he did not live with his brother during this time period, but that he was not even in the country after March 2003, having been deported to the Philippines *(Id.* 0048)*.* The denial decision did not discuss this discrepancy between Christopher's sworn declaration and the Officers' notes, either. The Agency's selective interpretation leaves the court uneasy about the agency's decision-making process and reinforces the need for a more thorough evaluation of the case. *See Valdivia v. Barr*, 420 F. Supp. 3d 809, 814 (N.D. Ill. 2019) (finding that the decision under review "does not provide 'a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'") (citing *State Farm*, 463 U.S. at 43).

      Aside from these issues that directly bear on the veracity of the Immigration Officers' report, USCIS also omitted several relevant pieces of evidence from its analysis. The denial of Bristow's I-130 petition cites its earlier denial of Pass's 2001 I-130 to assert the presence of "fraud indicators" dating back to Pass and Villamil's 2003 interview with USCIS. Two of these indicators highlighted by USCIS were that Pass's I-130 petition had a "lack of bona fides" and specifically that the couple had only provided "evidence of comingled assets for one month or less." (R. 0011.) But that assessment is flawed: the agency ignored three of the five documents Pass and Villamil submitted in support of their petition. And, of these five documents, four demonstrated comingled assets spanning approximately one year. (*Id.* 0254–64.) USCIS's failure to recognize this is problematic because it weighs directly against the finding of marriage fraud. *See Lam*, 698 F.3d at 534 (holding that "failure to . . . consider factors acknowledged to be material to such an exercise—such as the wholesale failure to consider evidence—[is] an error of law" (internal quotation marks and citations omitted)); *Anyaso*, 2024 WL 532223, at *9 (noting that documents countering USCIS's narrative "detract from the USCIS's ability to infer from only circumstantial evidence that [plaintiffs] did not intend to establish a life together").

**CONCLUSION**

The court recognizes that USCIS is entitled to a very generous standard of review for its decision, and the court should affirm if "a reasonable mind could find adequate support for the decision." *Ogbolumani*, 557 F.3d at 733. Yet in this case "adequate support" requires more than a preponderance of the evidence. A more carefully reasoned review of relevant evidence may well be adequate to support USCIS' determination that Plaintiff Villamil's marriage to Marilyn Pass was fraudulent, rendering him ineligible for I-130 relief. In light of the flaws in the agency's review and analysis, however, the court is unwilling to affirm that determination on this record. This case is remanded to the agency for further review. Plaintiffs' motion for summary judgment [40] is granted and Defendants' motion [37] is denied.

ENTER:

Dated: March 28, 2024

_____
REBECCA R. PALLMEYER
United States District Judge